STATE BANK OF LAKE ZURICH, Plaintiff-Appellant, v. WINNETKA BANK, as Trustee, Defendant (Jack A. Lofstrom *et al.*, Defendants; Spancrete of Illinois, Inc., *et al.*, Defendants-Appellees).

Second District   Nos. 2—92—0626, 2—92—0678 cons.

Opinion filed May 24, 1993.

Richard Lee Stavins, of Robbins, Salomon & Patt, Ltd., Mark J. Rose, and Peter J. Miller & Associates, all of Chicago (Peter J. Miller, of counsel), for appellant.

Richard W. Laubenstein, of DiMonte & Lizak, of Park Ridge (Alan L. Stefaniak, of counsel), and Sidney H. Mathias, of Mathias & Schmarak, P.C., of Arlington Heights, for appellee Theodore Brickman Company.

Gene A. Eich, of Morton Grove, for appellee Ewing-Doherty Mechanical, Inc.

Maria G. Arias-Chapleau and Douglas M. Reimer, both of McDermott, Will & Emery, of Chicago (Douglas C. Tibble, of counsel), for appellee Spancrete of Illinois, Inc.

JUSTICE COLWELL delivered the opinion of the court:

Plaintiff, State Bank of Lake Zurich (State Bank), initiated this action to foreclose its mortgage on certain real property located in North Barrington, Illinois. Numerous contractors were joined as defendants, who in turn filed counterclaims to foreclose their mechanic's liens on the property. Theodore Brickman Company (Brickman), Ewing-Doherty Mechanical, Inc. (Ewing), and Spancrete of Illinois (Spancrete) are the only such defendants involved in this appeal. After a bench trial, the circuit court of Lake County held the mechanic's lien claims of these remaining contractors stood equally with each other and had priority over State Bank's mortgage lien. State Bank appeals, contending (1) State Bank has priority over Brickman's mechanic's lien because the bank's mortgage was recorded before Brickman entered into its construction contract, and (2) State Bank is in parity with Spancrete and Ewing since it paid for the bulk of the enhancement to the property. We affirm.

Jack A. Lofstrom purchased a parcel of real estate located at 12 South Wynstone Drive in North Barrington for a price of $154,500 sometime early in 1988. Lofstrom was the president and sole director and shareholder of S.G. Royal, Ltd., a corporation involved with de-

veloping several residential properties. S.G. Royal, Ltd., was incorporated in 1980 and dissolved in 1991.

Construction on this property began between March and May 1988. Several documents in the record indicate S.G. Royal, Ltd., acted as general contractor in commencing the construction at 12 South Wynstone Drive, although no written contract exists. Ewing contracted in writing to perform sewer and plumbing work on April 14, 1988, and Spancrete orally contracted for labor and installation of concrete materials around this time. Spancrete's contract was put in writing on May 4, 1988. Brickman later contracted with S.G. Royal, Ltd., on August 1, 1988, to provide landscaping materials and labor.

In March 1988, Lofstrom asked State Bank for a $600,000 construction loan to build a luxury home on this lot. State Bank issued a letter of commitment for the amount requested to "Jack A. Lofstrom, President, S.G. Royal, Inc." In May 1988, Lofstrom transferred title of the property to Winnetka Bank, as trustee of a land trust with Lofstrom as beneficiary. A note dated June 10 indicates that Lofstrom borrowed $600,000 from State Bank, and the bank in turn received a mortgage as security on the property. Lofstrom personally guaranteed the note. The mortgage provided that the total amount of indebtedness was to be paid as a single payment due June 10, 1989. In addition, the mortgage document provides in paragraph 2:

> "Any advances made by the mortgagee to the mortgagor *** at any time before the release and cancellation of this Mortgage, but at no time shall this Mortgage secure advances on account of said original Note together with such additional advances, in a sum in excess of $<u>none</u> provided that nothing herein contained shall be considered as limiting the amounts that shall be secured hereby *** in accordance with covenants contained in this Mortgage."

The mortgage further states:

> "The mortgagor covenants:
> * * *
>
> (c) This mortgage contract provides for additional advances which may be made at the option of the Mortgagee and secured by this mortgage, and it is agreed that in the event of such advances the amount thereof may be added to the mortgage debt and shall increase the unpaid balance of the note hereby secured by the amount of such advance and shall be a part of said note indebtedness under all of the terms of said note and this contract as fully as if a new such note and contract were executed and delivered."

This mortgage was recorded in Lake County on June 29, 1988. Lofstrom testified that he knew at the time that he borrowed the money that this amount was not going to be enough to complete the project. Lofstrom's understanding was that in the event additional funds became necessary, State Bank would lend the requisite amount as part of the previous transaction.

The parties established a construction loan escrow agreement on June 24, 1988, in order to provide money for payouts to be used to construct the luxury home on the property. This document designated S.G. Royal, Ltd., as the general contractor and Jack Lofstrom, beneficiary of Winnetka Bank, as the owner. State Bank agreed to deposit $588,000 of the $600,000 loan into this account. Payments by State Bank from the construction loan escrow were made to S.G. Royal, Ltd.

Lofstrom requested that State Bank loan him additional funds in September 1988 to complete construction of the project. Lofstrom asked State Bank to advance him 80% of the new current appraisal of $1,750,000 to make the payout and complete the project. State Bank agreed to lend Lofstrom additional funds in the amount of $340,000. The June note was stamped "paid by renewal," and the bank executed a new note dated September 21, 1988, in the amount of $940,000, which encompassed the original $600,000 loan amount and the additional $340,000. This note was also personally guaranteed by Jack A. Lofstrom. An additional mortgage indicating this indebtedness, also dated September 21, was recorded in Lake County on October 12, 1988. The record indicates that the June mortgage was never marked cancelled or released, nor was a release deed ever prepared or recorded. The loan documents show, however, that the bank did not actually receive any money at this juncture and was still owed the full balance of $600,000.

Brickman, Ewing, and Spancrete all performed as agreed under their contracts with S.G. Royal, Ltd. Lofstrom subsequently defaulted on loan payments, and State Bank filed its original complaint to foreclose on its September 21 mortgage in the amount of $940,000. State Bank's first amended complaint also only referred to the September mortgage; however, State Bank's second amended complaint alleged it was suing to foreclose on its June 10 mortgage as modified by the September 21 mortgage. Brickman, Ewing, and Spancrete filed counterclaims to foreclose their mechanic's liens.

State Bank sought priority over Brickman's mechanic's lien by alleging the June 1988 mortgage predated Brickman's contract with S.G. Royal, Ltd., on August 1, 1988. State Bank contended that the

recording date on the June mortgage was the proper reference for determining priority of Brickman's lien and the mortgage lien. State Bank argued that the September mortgage was a modification and renewal of the June loan and thus the two mortgages were part of the same transaction. Since the June mortgage, recorded on June 29, predated Brickman's contract on August 1, State Bank claimed it had priority over Brickman's lien.

At trial, Peter J. McDaniel, loan officer for State Bank at the time of the transaction, testified he prepared both the June and September loan documents. McDaniel acknowledged that his letter to Sharon Ruane, the processor on the construction escrow on this project, referred to the September mortgage as the "new mortgage document." McDaniel said the bank had prepared a new note and mortgage rather than a loan modification agreement in connection with the loan increase because this was the bank's typical practice when the principal balance was increased. McDaniel noted the September note indicated in the upper righthand corner that it is a renewal or extension of the June note. He further stated that the September mortgage does not refer to the June mortgage because it was not the bank's intention to release the June mortgage. McDaniel testified that with a loan of this type, where there were additional advances, the bank would not release any of the recorded liens until the loan was paid off in full. He said the bank considered the September transaction to be an extension of the June mortgage.

McDaniel admitted that State Bank's letter to Lofstrom on March 10, 1989, regarding default on the construction loan only referred to the September loan. McDaniel also stated the June note showed a zero balance as of October 10, 1988. McDaniel said that the bank stamped the June mortgage as paid by renewal on October 26, 1988, but that the bank did not actually receive any money at the time the note was renewed. McDaniel testified that State Bank made inspections of the construction site at 12 South Wynstone Drive. He acknowledged that the reports and accompanying pictures indicated the foundation and the first-floor framing were completed as of June 27, 1988, two days before the June mortgage was recorded.

Don Russell Stetsinger, a State Bank loan officer, testified that the total amount owed to the bank at the time of trial was $1,473,227.34, comprised of unpaid principal of $940,000 and accrued interest of $450,744.70.

State Bank stipulated at trial that both Ewing's and Spancrete's claims predate the bank's mortgage and thus have priority over State Bank's claim. However, State Bank argued that it should be in parity

with Ewing and Spancrete since State Bank paid substantial monies towards the completion of the improvements upon the property after the recordation of its mortgage as evidenced by its checks issued from the loan escrow account.

The trial court found in its judgment of foreclosure and sale that State Bank's September note was not merely a renewal or modification of the June note. Rather, State Bank's advancement of the additional $340,000 was new consideration which rendered the September document a new and independent note. Since the September note was only secured by the mortgage recorded October 12, 1988, the trial court determined that only this mortgage may be foreclosed.

The trial court also found that S.G. Royal, Ltd., was a separate entity from Jack Lofstrom and that S.G. Royal, Ltd., acted as the general contractor on the job. Thus Brickman was a subcontractor under S.G. Royal, Ltd., whose contract predated State Bank's mortgages and afforded Brickman a valid and subsisting prior lien upon the subject premises for $238,341.18.

The trial court found that a substantial sum from both the June and September loan proceeds went into improvements for the subject premises, but rejected State Bank's claim that this gave the mortgage priority over Ewing's and Spancrete's mechanic's liens. The court determined that State Bank, which had the burden of proof, did not produce evidence at trial from which the court could determine what amount of the loan proceeds was used to pay for improvements constructed upon the premises. The trial court awarded Ewing $36,533.63 and found the company's claim had priority over State Bank's mortgage. The trial court's judgment of foreclosure and sale awarded Spancrete a mechanic's lien for $9,342 plus interest. Ewing's and Spancrete's mechanic's liens were found to have absolute priority over the entire mortgage lien of State Bank, with the exception of a superior priority lien of $23,257 awarded to State Bank in recognition of certain services it performed to maintain the property. The trial court also found the mechanic's lien claims of Ewing and Spancrete on a parity with each other. State Bank filed a timely appeal.

State Bank contends its mortgage lien had priority over Brickman's mechanic's lien because the mortgage was recorded before the date of Brickman's contract. The Mechanics Lien Act (Act) (Ill. Rev. Stat. 1991, ch. 82, par. 1 et seq.) provides in section 1 as follows:

"Any person who shall by any contract or contracts, express or implied, with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve the lot or tract of land or to manage a struc-

ture thereon, or to furnish material, fixtures, apparatus or machinery, *** and has a lien upon the whole of such lot or tract of land and upon adjoining or adjacent lots or tracts of land of such owner ***. *** This lien attaches as of the date of the contract." Ill. Rev. Stat. 1991, ch. 82, par. 1.

The effective date of the mortgage is the date of its recording. (Ill. Rev. Stat. 1991, ch. 110, par. 15—1301.) The effective date of a mechanic's lien claim is the date of the contract. (Ill. Rev. Stat. 1991, ch. 82, par. 1.) State Bank recorded the June mortgage on June 29, 1988, and the September mortgage on October 12, 1988. Brickman contracted with S.G. Royal, Ltd., on August 1, 1988. State Bank alleges its claim dates back to June 29, since the September mortgage was a modification and renewal of the June mortgage which is a valid and subsisting lien as of the date it was recorded.

■ Illinois case law supports State Bank's argument. In *Whirlpool Corp. v. Bank of Naperville* (1981), 97 Ill. App. 3d 139, plaintiff filed an action to recover damages from alleged conversion by the bank of certain property in which plaintiff claimed to have a security interest superior to that of the bank. On October 4, 1973, debtor executed a security agreement with the defendant bank in exchange for a commitment to receive advances of cash or credit. The description of collateral to serve as security for the loan did not include inventory, but the description of collateral in financing statements filed in January 1974 did include inventory. On October 18, 1974, plaintiff filed a financing statement which covered certain collateral made by plaintiff and sold to debtor. On September 2, 1975, debtor executed a new note and security agreement to the bank which included inventory in its description of collateral. After the debtor defaulted, the bank seized the goods in February 1977 and sold them. The bank stated at the time that it based its action on the September 1975 agreement. At trial, the bank relied on the 1973 agreement and the January 1974 financing statement and contended its perfected security interest was superior to that of plaintiff. The trial court entered judgment for plaintiff. On appeal, this court held: "The fact that the Bank required a new agreement from the debtor *** and furnished fresh consideration is not dispositive. Merely taking the new note *even with an advance of additional cash* did not extinguish the old obligation *** where, as the debtor testified here, the new note was given in renewal and not in payment." (Emphasis added.) (*Whirlpool Corp.*, 97 Ill. App. 3d at 142.) Indeed, the ordinary practice of lending institutions is that where a note is given in renewal of another note and not in payment, the renewal does not extinguish the original debt or

change the debt except that it postpones the time for payment. *Heritage Bank v. Bruti* (1986), 141 Ill. App. 3d 107, 109; *Community Bank v. Meister Brothers, Inc.* (1973), 12 Ill. App. 3d 1004, 1008; *Continental Illinois National Bank & Trust Co. v. Cardwell* (1936), 287 Ill. App. 227, 246.

Although a renewal note may in some cases operate as payment of and a discharge of the original note, the evidence must indicate the parties intended that the new note should serve as payment of the outstanding note. (*Heritage Bank*, 141 Ill. App. 3d at 109; see also *Lurie v. Newhall* (1947), 333 Ill. App. 173.) Here, the evidence indicates the parties did not intend the September note and mortgage to be a new and separate transaction which extinguished the June note. The June mortgage was never cancelled or released, and the language therein provides for additional advances at the option of the mortgagee. The face of the June note was stamped "paid by renewal," and the September note specifically states it is a renewal of Cl No. 34737, the June note. Both loans were to be paid in full on June 10, 1989. The testimony of State Bank loan officers also established that when a balance of a loan is increased, a new note and mortgage are typically executed. The trial court erroneously concluded that the September mortgage was a new and independent mortgage. Accordingly, we find the September mortgage was a renewal or modification of the June mortgage and the June mortgage was a valid and subsisting lien on the subject property.

This finding is not dispositive, however, since we find that Brickman has priority under the provisions in section 21 of the Act relating to subcontractors. Section 21 of the Act provides that every subcontractor that provides materials and services for the contractor shall have a lien for the value thereof to the same property from the same time as provided for in the original contractor's lien. (Ill. Rev. Stat. 1991, ch. 82, par. 21.) Brickman's counterclaim alleged that it is entitled to a mechanic's lien against the premises for $184,550.10 plus interest and that such lien is a first and prior lien on the subject premises. Brickman contended that, as a subcontractor, its contract related back to the original agreement between the owner and S.G. Royal, Ltd., as general contractor. Brickman alleged that the evidence of construction completed as of June 27, 1988, indicated the contract between the owner and S.G. Royal, Ltd., preceded both the September and June mortgages of State Bank and thus gave Brickman priority over State Bank's lien claim since the mortgage was not recorded until June 29. The escrow agreement, dated June 24, 1988, evidenced a contract between S.G. Royal, Ltd., designated as general contractor,

and Jack Lofstrom as beneficiary of trustee Winnetka Bank. The evidence indicated that construction of the property commenced in April 1988 and had progressed quickly by June 27 according to the on-site inspection by State Bank. The amount of construction completed before the first mortgage was recorded on June 29 indicated a prior contract existed between the owner and general contractor.

State Bank contends that Brickman's contract makes it unclear whether Brickman made its agreement with Lofstrom or with S.G. Royal, Ltd. State Bank further contends that, whether the contract was made with Lofstrom or S.G. Royal, Ltd., both parties are deemed by law to be the owner, making their agreement with Brickman a general contract which does not relate back. See Ill. Rev. Stat. 1991, ch. 82, par. 21.

The record revealed that S.G. Royal, Ltd., had constructed 15 to 20 single-family residences since its incorporation in 1980. S.G. Royal, Ltd., had a construction superintendent on the subject premises on a daily basis and carried builder's risk insurance. Prior to the recording of the mortgage on June 29, 1988, S.G. Royal, Ltd., had also entered into numerous subcontracts with various tradesmen starting in April 1988 before the mortgage was recorded. S.G. Royal, Ltd., maintained bank accounts in its own name and did not comingle its assets with Lofstrom. All checks issued from the construction loan escrow, other than those made out to subcontractors, were made payable to S.G. Royal, Ltd. Moreover, numerous documents, including the escrow agreement which was prepared by McDaniel, the statements of payouts, the correspondence between the parties, as well as the testimony at trial all indicate that S.G. Royal, Ltd., is the general contractor.

State Bank cites to a line of cases which holds that when an owner proceeds with construction under the name of a corporate construction company which is really the owner operating under a corporate name, the contractors are not subcontractors but are original contractors because the construction company is, in the eyes of the law, deemed to be the owner for mechanic's lien purposes only. These cases address the concern that a corporation not be used or created as a device to avoid an individual's obligation to workmen established by a mechanic's lien. (*Illinois Interior Finish Co. v. Poenie* (1934), 277 Ill. App. 554, 566.) However, the cases cited by State Bank involved either sham corporations formed specifically for construction of a particular project or formed to perpetrate fraud. Here, S.G. Royal, Ltd., remained a corporation in good standing from 1980 to 1991 and was not formed merely for the 12 South Wynstone Drive project.

All of these factors form a distinction between Lofstrom and S.G. Royal, Ltd. The evidence overwhelmingly supports the trial court's finding that Brickman was a subcontractor whose construction contract related back to the owner's original contract with S.G. Royal, Ltd., and gave Brickman's subcontractor lien priority in time to the filing of the plaintiff's mortgage.

In its final contention, State Bank acknowledges it does not have priority over Ewing and Spancrete since both Ewing and Spancrete contracted with S.G. Royal, Ltd., before the June mortgage was recorded. However, State Bank argues its lien stands in parity with these mechanic's lien claims since it paid substantial monies towards the completion of the improvements upon the property after the recordation of its mortgage. Section 16 of the Act provides in relevant part:

"No incumbrance upon land, created before or after the making of the contract *** shall operate upon the building erected, or materials furnished until a lien in favor of the persons having done work or furnished material shall have been satisfied, and upon questions arising between incumbrancers and lien creditors, all previous incumbrances shall be preferred to the extent of the value of the land at the time of making of the contract, and the lien creditor shall be preferred to the value of the improvements erected on said premises ***." (Ill. Rev. Stat. 1991, ch. 82, par. 16.)

State Bank argues that since it paid $940,000, or approximately 90%, of the cost of the improvements, the bank contends it will suffer 100% of the loss if not given priority over these remaining subcontractors.

■ The priority of claims as between a subcontractor and a mortgagee is a function of the priority as between (1) the date of recording of the mortgage, *i.e.*, the date when the subcontractor is considered to have constructive notice, and (2) the date of execution of the underlying construction contract pursuant to which the materials or services were provided by the subcontractor. (*Firstsouth, F.A. v. La Salle National Bank* (N.D. Ill. 1991), 766 F. Supp. 1488, 1489; *Du Page Bank & Trust Co. v. Du Page Bank & Trust Co.* (1984), 122 Ill. App. 3d 1015, 1018.) Generally, the priority of a contractor's lien must be based on its strength as a contributor to the enhanced value of the property. (*Moulding-Brownell Corp. v. E.C. Delfosse Construction Co.* (1940), 304 Ill. App. 491, 500.) In *Detroit Steel Products Co. v. Hudes* (1958), 17 Ill. App. 2d 514, the court determined that since the materialman's contract antedated the mortgage recording, the

994

language of section 16 as it relates to proof of enhancement was clearly inapplicable and the entire claim of the materialman, properly perfected under the Act, had absolute priority both as to land and improvements. (*Detroit Steel Products Co.*, 17 Ill. App. 2d at 518-19.) Similarly, Ewing's and Spancrete's contracts predated the recording of State Bank's June mortgage.

■■ The priority of their properly perfected mechanic's lien claims made evidence of enhancement immaterial. We find that Spancrete and Ewing both obtained their mechanic's liens before State Bank recorded its first mortgage in June, and section 16 of the Act does not limit their absolute priority over State Bank's lien.

We note that the object and purpose of the Act is to protect those who in good faith furnish material or labor for the construction of a building. (*Daily v. MidAmerica Bank & Trust Co.* (1985), 130 Ill. App. 3d 639, 641.) The statute is strictly construed as to the requirements which bring one within the statute, but this strict construction applies only to the requirements upon which the right to a lien depends and is not used to invalidate a lien which had properly attached. *Du Page Bank & Trust Co.*, 122 Ill. App. 3d at 1019-20.

Affirmed.

McLAREN and BOWMAN, JJ., concur.